UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Dickinson R. Debevoise |
| | : | United States District Judge |
| | : | |
| v. | : | Crim. No. 09-878 (DRD) |
| | : | |
| ABDUL WILLIAMS | : | <u>SEALING ORDER</u> |

This matter having come before the Court upon the application of the United States of America (Rachael A. Honig, Assistant U.S. Attorney, appearing), for an order sealing the documents submitted to the Court in this matter,

IT IS, on this _4th_ day of February, 2010,

ORDERED that the documents submitted to the Court by the United States in this matter and this Order shall be and hereby are SEALED until further order of the Court.

HON. DICKINSON R. DEBEVOISE
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Dickinson R. Debevoise |
| | : | United States District Judge |
| | : | |
| v. | : | Crim. No. 09-878 (DRD) |
| | : | |
| ABDUL WILLIAMS | : | <u>SEALED ORDER</u> |

This matter having come before the Court upon the <u>ex parte</u>, sealed application of the United States of America (Rachael A. Honig, Assistant U.S. Attorney, appearing) for an order permitting the release of certain documents and materials (the "Evidence") to the prosecution team in this matter, and the Court having considered the submission of the United States, and for good cause shown,

IT IS THE FINDING OF THIS COURT that, based on the evidence supplied by the United States and reviewed by the Court, no constitutional or other rights of the defendant were violated in the gathering of the Evidence or its provision to the government.

WHEREFORE, it is on this 4Th day of February, 2010,

ORDERED that the documents and materials pertaining to the statements of defendant to Douglas Cantey and James Ahmadi may be provided to the prosecution team; and it is further

ORDERED that the prosecution team may use the Evidence in furtherance of the above-captioned case; and it is further

ORDERED that this Order, and all related documents, shall be, and hereby are, sealed, on the basis of their relationship to an ongoing grand jury investigation.

HON. DICKINSON R. DEBEVOISE
United States District Judge

2

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

| | | |
|---|---|---|
| *Rachael A. Honig*<br>*Assistant U.S. Attorney* | *970 Broad Street, Suite 700*<br>*Newark, NJ 07102* | *(973)645-2777* |

February 3, 2010

## SUBMITTED EX PARTE & UNDER SEAL – GRAND JURY MATTER

Hon. Dickinson R. Debevoise
United States District Judge
Martin Luther King, Jr. Federal Building
    & Courthouse
50 Walnut Street
Newark, New Jersey 07102

             Re:    <u>United States v. Abdul Williams</u>, Crim. No. 09-878 (DRD)

Dear Judge Debevoise:

         Please accept this letter in lieu of a more formal submission in support of the application, by the United States, for a ruling that certain information and materials gathered in the course of an ongoing grand jury investigation may be released to the prosecution team in the above-captioned matter.

### BACKGROUND

         On August 12, 2009, defendant Abdul Williams was charged by criminal complaint, Mag. No. 09-3135. The one-count complaint charged defendant with knowingly possessing a firearm having been previously convicted of a felony offense, in violation of 18 U.S.C. § 922(g)(1). Defendant earlier had been charged with this conduct in Essex County, at which time he was represented by Paul Bergrin, Esq. As the Court may be aware, Bergrin currently is under indictment in this District, Crim. No. 09-369 (WJM), and has been charged with a number of crimes, including witness intimidation, bribery, and conspiracy to murder a witness.

         According to the affidavit accompanying the complaint against defendant, on June 8, 2007, defendant, who between 1996 and 2003 was convicted of at least nine felony offenses, was approached by law enforcement officers on a sidewalk on North Munn Avenue in Newark. At the time, defendant was accompanied by two other individuals, brothers Jerome and Kyle Eley. Defendant began to walk away from the officers, and, while doing so, discarded an object. This object was recovered by the officers and revealed to be a handgun with red tape around its handle.

Defendant was arrested on the basis of the federal criminal complaint on August 24, 2009. In an initial appearance before U.S. Magistrate Judge Patty Shwartz, defendant was ordered detained and committed to the custody of the U.S. Marshal. Thereafter, defendant was held at the Hudson County Jail.

On November 4, 2009, defendant made a renewed bail application to the Court. This application was opposed by the United States and denied, on November 6, 2009, by U.S. Magistrate Judge Madeline Cox Arleo. Upon information and belief, therefore, defendant has remained in custody at the Hudson County Jail continuously from August 24, 2009, to the present.

On November 23, 2009, a grand jury sitting in Newark returned a one-count Indictment charging defendant with the June 8, 2007, possession of a firearm described in the complaint. A Superseding Indictment was returned on December 21, 2009. This Indictment added a second count, charging defendant with an additional violation of 18 U.S.C. § 922(g)(1) occurring on or about July 15, 2008.

This matter is currently set for trial before Your Honor on March 17, 2010. Your Honor also has scheduled a March 1, 2010 hearing for the purpose of oral argument on defendant's motion *in limine* to admit the prior statement of an individual named Jamal Muhammad. On or about July 5, 2007, Muhammad provided a formal written statement to the Newark Police Department in which he claimed that it was he, not defendant, who had possessed the red-tape-wrapped handgun on June 8, 2007. As detailed in the government's opposition to defendant's motion, Muhammad has invoked his Fifth Amendment rights and refused to testify before the federal grand jury investigating these matters.

Recently, counsel for two individuals incarcerated with defendant at the Hudson County Jail contacted the prosecution team to indicate that their respective clients had information relating to defendant that they wished to provide to the government. One of these individuals, Douglas Cantey, has been detained since July 30, 2009, on a criminal complaint charging him with credit card fraud, which remains pending as of this date. The other, James Ahmadi, was detained from approximately June to September 2009, on the basis of an alleged violation of supervised release, and again from approximately December 2009 to the present, on the basis of a second alleged violation.

The prosecution team conducted preliminary proffer sessions with Cantey and Ahmadi in early January 2010. FBI reports summarizing these proffer sessions are attached hereto as Exhibits A (Cantey) and B (Ahmadi). Cantey's proffer, in particular, revealed that Cantey had information relevant to the pending case against defendant as well as to other matters.

As a result, and in an abundance of caution, the undersigned was appointed as a "taint" or "filter" Assistant U.S. Attorney and a team of agents from the FBI who are not involved with the case were appointed as "taint" or "filter" agents (collectively, the "filter

-2-

team"). The filter team conducted additional proffer sessions, with Cantey on January 25, 2010, and with Ahmadi on January 26, 2010. The reports prepared by the FBI agents on the filter team regarding Cantey's and Ahmadi's statements are attached hereto as Exhibits C and D, respectively.

In substance and in part, Cantey informed the filter team at his January 25 proffer that while he did not know defendant prior to defendant's arrival at the Hudson County Jail, once defendant arrived there, in or about August 2009, he and defendant became acquainted and defendant frequently sought Cantey out for advice about his case. In particular, Cantey related that within a few days of the denial of defendant's bail application (which, as set forth above, occurred on November 6, 2009), defendant asked for Cantey's advice about his case and Cantey responded, in substance and in part, that defendant should "talk to him" and tell him the truth about the facts of the case if he wanted Cantey to advise him properly. In response, defendant admitted that it was indeed he, and not Jamal Muhammad, who had possessed the red-tape-wrapped handgun on June 8, 2007. Defendant explained to Cantey that after being released on bail, his attorney, Bergrin, had suggested that if someone else could be found who would agree to say the gun was his, defendant could "walk away" from the charge. Defendant further disclosed to Cantey that defendant secured Muhammad's participation himself but that Bergrin was the one who arranged for an attorney for Muhammad and negotiated the price for Muhammad's services. According to Cantey, defendant stated that Muhammad was to get $20,000 for claiming ownership of the gun, a portion of which was to be paid up front and the remainder of which was to be paid at the conclusion of the case. Cantey stated that he did not consider coming forward with this information at the time he had this conversation with defendant and that he made the decision to do so only subsequently, when he was sent to "the hole" for an alleged extortion attempt against another inmate. Cantey further stated that he has never previously cooperated with the government and that he was not cooperating or contemplating cooperation at the time he had the above-described conversation with defendant.

At his January 26 proffer, Ahmadi stated, in substance and in part, that he and defendant knew of one another prior to their incarceration in the Hudson County Jail but did not know each other well. In or about August and September of 2009, when both Ahmadi and defendant were detained at the jail, they became better acquainted, in part, according to Ahmadi, because both were from Newark and of the Muslim faith. Ahmadi was released from detention in September 2009, but was detained again on December 11. Ahmadi and defendant then shared a cell for a period of approximately four days, beginning on or about December 14. According to Ahmadi, on the evening of December 14, defendant confided that when defendant was arrested in 2007, Bergrin told defendant that he should find another person to "take the gun" for him. Defendant also told Ahmadi that he did as Bergrin suggested and arranged for an individual named "Muhammad" to claim ownership of the gun. Defendant then had his younger sister pay both Muhammad and Muhammad's lawyer for their participation. In addition, defendant stated to Ahmadi that he intended to have Muhammad come to federal court and invoke the Fifth Amendment so that Muhammad would not get "tripped up" by federal prosecutors. Ahmadi stated at the proffer session that he has never previously cooperated with the government and that

-3-

he, like Cantey, made the decision to come forward with this information only after this conversation took place, when Ahmadi was sent to "the hole" in connection with the same alleged extortion for which Cantey was disciplined. Ahmadi reported that he has had no further discussions with defendant since approximately December 18, when he was removed from the cell he shared with defendant and sent to "the hole."

Both Cantey and Ahmadi were instructed by the filter team, in the presence of their respective counsel, that should they come into contact with defendant, they should initiate no further discussions with defendant regarding any of these matters and that they should not attempt to gather any further information from defendant. Cantey received similar instructions during his earlier proffer session with the prosecution team.

The filter team now seeks to release information and materials relating to Cantey's and Ahmadi's statements (hereinafter, the "Evidence") to the prosecution team for use in prosecuting the instant case as well as in furtherance of the ongoing grand jury investigation into possible attempts at obstruction of justice and witness tampering. Based on the facts of this case, and for the reasons set forth below, it is the government's position that no rights or privileges of the defendant were violated either when these witnesses received the information in question or when it was provided to the government, and that no such violation will occur should the Evidence be provided to the prosecution team.

## DISCUSSION

I.      **The Evidence Was Not Obtained In Violation of Defendant's Constitutional Rights.**

In the line of cases originating with Massiah v. United States, 377 U.S. 201 (1964), the Supreme Court has held that under certain circumstances, the use of evidence elicited from jailhouse informants may violate a defendant's Sixth Amendment right to counsel. In particular, once the right to counsel has attached, a defendant "is denied that right when federal agents 'deliberately elicit' incriminating statements from him in the absence of his lawyer." Kuhlmann v. Wilson, 477 U.S. 436, 457 (1986) (quoting Massiah, 377 U.S. at 206). On the other hand, the Sixth Amendment "is not violated whenever – by luck or happenstance – the State obtains incriminating statements from the accused after the right to counsel has attached," Maine v. Moulton, 474 U.S. 159, 176 (1985), and a defendant "does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." Kuhlmann, 477 U.S. at 459.

As articulated by the Third Circuit, the Massiah line of cases "establish three basic requirements for finding a Sixth Amendment violation: (1) the right to counsel must have attached at the time of the alleged infringement; (2) the informant must have been acting as a 'government agent'; and (3) the informant must have engaged in 'deliberate elicitation' of incriminating information from the defendant." Matteo v. Superintendent, SCI Albion, 171 F.3d

-4-

877, 892 (3d Cir. 1999). If any of these requirements is lacking, no Sixth Amendment violation has occurred.

Here, the United States assumes, for the sake of argument, that the first requirement has been met, given that defendant at the very least had been charged by criminal complaint, was in custody, and was actually represented by an attorney at the time he made the statements in question. Nevertheless, it is clear that the second requirement has not been satisfied and that no Sixth Amendment violation has occurred, because neither Cantey nor Ahmadi were acting as "government agents" at the time that they received defendant's statements.

In Matteo, the Third Circuit considered at length the question of what suffices to make an informant a government "agent" for purposes of Massiah. In that case, the informant, Lubking, had received a call from the defendant, Matteo, asking him to retrieve a weapon implicated in the murder for which Matteo had been charged. Lubking told Matteo he wanted to think about Matteo's request and consult with counsel, and asked Matteo to call back the following evening. In the interim, Lubking, on the advice of his attorney, informed the prosecutor's office about the conversation and gave his consent for the police to record Matteo's upcoming call. The police proceeded to do so, apparently by having Lubking operate the recording equipment. Matteo made certain incriminating statements during the call that were used against him at trial.

Reviewing the decision of the Pennsylvania court below, the Third Circuit held that the court had not erred in deciding that Lubking was not acting as a government agent when he recorded Matteo's call, finding that "there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation [of the defendant's statements] takes place." 171 F.3d at 893 (citation and punctuation omitted). The Court found that the record "amply" supported the state court's determination that, at the time Lubking recorded Matteo's statements, no deal had been struck between Lubking and the police under which Lubking would receive some kind of benefit in exchange for cooperating with the investigation. Id. at 894. The Court further commented that "[w]e will not speculate or infer the existence of a quid pro quo agreement simply because the informant's motives may not have been entirely altruistic." Id.

Here, as in Matteo, there was no agency relationship between the government and either Cantey or Ahmadi at the time defendant made his statements to those individuals. Neither Cantey nor Ahmadi were actively cooperating – or even attempting to cooperate – with the government at the time the statements were made, and neither were acting under the government's supervision or direction. Instead, both came forward only after their conversations with defendant were complete and the statements had already been made. Under these

-5-

circumstances, the Sixth Amendment has not been violated.[1]  See United States v. Baldwin, 428 F.2d 182, 184 (3d Cir. 1970) (holding that "the Constitution does not require the exclusion of post-indictment statements voluntarily given by the defendant, regardless of how those statements are later discovered by the prosecution").

Matteo makes clear that whether the informant was acting as a government agent is to be assessed as of the time the "elicitation" of the defendant's statements takes place.  See 171 F.3d at 893.  It is worth noting, however, that there continues to be no agency relationship between the government and either Cantey or Ahmadi today, as neither has been promised any particular benefit in exchange for the information he has provided.  While it is reasonable to infer that these individuals may have a hope or an expectation that they may ultimately receive a benefit in the form of a reduced sentence in their own pending cases, the government represents to the Court that it has made no promises in this regard.

Furthermore, defendant's statements to Cantey and Ahmadi raise no Fifth Amendment issues.  See Illinois v. Perkins, 496 U.S. 292, 296-298 (1990).  Thus, there is no constitutional impediment to the receipt of the Evidence by the prosecution team, and the United States respectfully requests that the Court so order.

## II.         Government Attorneys Violated No Ethical Rules In Obtaining the Evidence.

In addition to the requirements of the Constitution, government attorneys are of course bound by the ethical rules governing lawyers generally, which include rules that limit direct and indirect contacts with represented parties.  See New Jersey Rules of Professional Conduct 4.2 (prohibiting contact with represented parties) and 4.4 (prohibiting use of methods of obtaining evidence that violate the rights of third parties).  Here, no government attorney has directly contacted defendant.  Moreover, no improper indirect contact has taken place, because neither Cantey nor Ahmadi were acting at the direction of government attorneys when the conversations with defendant occurred.  As set forth above, each has been instructed to refrain from eliciting further information from defendant should they come into contact with defendant again.

---

[1]         Because the second Massiah requirement manifestly has not been met, the United States does not here discuss the existence of the third requirement, namely, that the informant have deliberately elicited the incriminating statements, rather than passively receiving them. Should the Court require additional briefing on this issue, the United States will be happy to provide it.

## CONCLUSION

Based on the foregoing, the United States respectfully requests that the Court order that the Evidence (including, but not limited to the Forms 302 attached hereto as Exhibits A through D) may be released to the prosecution team and that the prosecution team may meet with Cantey and Ahmadi to discuss the matters set forth herein.  A proposed form of order is enclosed.

Respectfully,

PAUL J. FISHMAN
United States Attorney

By: RACHAEL A. HONIG
Assistant U.S. Attorney

Encl.

-7-

# EXHIBIT A

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    01/11/2010

     On 01/08/10, DOUGLAS CANTEY, black male, date of birth 05/08/67, currently an inmate at the Hudson County Jail, was interviewed at the United States Attorney's Office, Newark, New Jersey. This interview took place at the request of CANTEY through his legal counsel. CANTEY was provided with a proffer agreement, which he read and signed. He was then interviewed in the presence of his counsel by Assistant United States Attorney Anthony Mahajan, and Special Agent Stephen Egbert and Detective James Eirand of the Federal Bureau of Investigation.

     CANTEY has been in the same housing unit at the Hudson County Jail as ABDUL WILLIAMS since August 2009.  CANTEY also knew WILLIAMS to go by the alias "MUTALLIC" (ph) or "MU". He is currently in a segregated disciplinary unit, but had been WILLIAMS cellmate, and will be back in WILLIAMS unit once his disciplinary period is completed.  CANTEY had no prior relationship with WILLIAMS; he is from Paterson, NJ, and WILLIAMS is from Newark, NJ, and they have no mutual acquaintances.

     WILLIAMS previous cellmate had been DAVE KIRKLAND. CANTEY was friends with KIRKLAND, and when KIRKLAND left the jail after being sentenced, WILLIAMS began to speak with CANTEY as a confidante.  They discussed a variety of topics, to include WILLIAMS current weapon possession charges, as well as WILLIAMS involvement with illegal drug distribution.

     WILLIAMS spoke of an individual he referred to as "ALI HAK", being part of a "drug unit" with PAUL BERGRIN. HAK "worked for" BERGRIN, up until HAK was arrested as part of a federal indictment.  WILLIAMS was a close associate of HAK, and would have been caught up in the federal indictment himself, had he not been in State prison for a shooting at that same time.

     When WILLIAMS got out of State prison, HAK recommended him to BERGRIN as a replacement for HAK's role in the drug organization. As a result, BERGRIN gave WILLIAMS a job in his law firm, possibly as a paralegal, but CANTEY wasn't sure of his job title.  Additionally, BERGRIN let WILLIAMS drive his car, which was a luxury foreign car. CANTEY knew that WILLIAMS would often take BERGRIN's car to get detailed.

---

Investigation on    01/08/10    at  Newark, New Jersey

    804B-NK-C112914

File #  272B-NK-115490 9A-NK-117645                    Date dictated

    SA Stephen M. Egbert/sme

by    DET James Eirand

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

272B-NK-115490

Continuation of FD-302 of ___DOUGLAS CANTEY_____ . On _01/08/10_____ , Page ___2___

    Once WILLIAMS was on board, BERGRIN introduced WILLIAMS to his "drug connect," the men who supplied the drugs that made money for PAUL BERGRIN. CANTEY knew the men to be foreign born brothers, either from Mexico or the Dominican Republic. These brothers supplied a large quantity of drugs to WILLIAMS; in fact, an unidentified inmate told CANTEY that WILLIAMS had "the birds" (a reference to kilos of cocaine), and "ran" a particular housing project.

    The "drug connect" (these two brothers) are incarcerated in the same jail housing unit as WILLIAMS and CANTEY. Their presence in the same housing unit led WILLIAMS to believe that the men were looking to "set up" WILLIAMS, so WILLIAMS was avoiding them. The father of these brothers was also part of the drug conspiracy, as well as their sister, who is PAUL BERGRIN's girlfriend. WILLIAMS knew that the "drug connect" was in jail for multiple kilos of cocaine.

    At some point in their relationship, CANTEY was present when another inmate, known to him only as "TITO" came over to speak with WILLIAMS. "TITO" is represented by the same attorney as WILLIAMS. During a court appearance for TITO, he overheard a prosecutor tell TITO's attorney that another indictment was "coming down" onto WILLIAMS. WILLIAMS became very upset, and stated, "I hope they don't put me in that PAUL shit." WILLIAMS made it clear that he believed that BERGRIN was ultimately going to implicate him (WILLIAMS) in BERGRIN's own criminal activity. CANTEY did not believe that WILLIAMS has been in contact with BERGRIN since WILLIAMS has been in jail, although he knows that WILLIAMS is always on the telephone.

    Since WILLIAMS has been incarcerated, people who work for the "drug connect" have been supplying WILLIAMS' sister, who has been running the drug operation in his absence. On one occasion, these unknown persons brought 8 kilos of cocaine to give to WILLIAMS' sister. However, WILLIAMS' father was present for this meeting, and refused to allow the drug transaction to occur, believing it to be a "set up."

    With regard to WILLIAMS' gun possession indictment, WILLIAMS told CANTEY that he (WILLIAMS), through WILLIAMS' sister, paid $20,000 to another male to falsely claim that WILLIAMS' pistol actually belonged to this other male. WILLIAMS, through his sister, then obtained an attorney to represent the male who would make the false claim that the pistol was his. CANTEY was unsure if WILLIAMS

FD-302a (Rev. 10-6-95)

272B-NK-115490

Continuation of FD-302 of ____DOUGLAS CANTEY_____ . On 01/08/10 , Page ___3___

paid for the fee of this attorney, but he knew that WILLIAMS and his sister got this particular attorney to represent the unknown male. The attorney who was selected to represent the unknown male is aware that this male was paid by WILLIAMS to falsely claim that WILLIAMS weapon was his.

The male, who was paid $20,000, was selected for several reasons. He was in the general area of WILLIAMS' gun arrest. The man was known to have very little money, and lastly was believed to have a minimal criminal record. As such, even if the man were charged by the police for coming forward to claim WILLIAMS' pistol as his own, he would be facing minimal jail time.

CANTEY was directed not to solicit information from WILLIAMS regarding his pending gun possession charges.

# EXHIBIT B

302 (Rev. 10-8-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    01/07/2010

After being advised of the identity of all Law Enforcement Personnel present (SA Philip J. Blessington FBI, TFO Lou Velez North Bergen, New Jersey Police Department, SA Shawn Brokos FBI and SA Matt Koppinger DEA) and the Assistant Unites States Attorneys present (Rob Frazer and Anthony Mahajan), and in the presence of his legal counsel (PETER CARTER), **PROTECT IDENTITY** JAMES T. AHMADI * **PROTECT IDENTITY** provided the following information as it relates to ABDUL WILLIAMS:

AHMADI stated the reason AHMADI reached out for the United States Attorney's Office in Newark, New Jersey, was because AHMADI had information about illegal activity that WILLIAMS was either involved or associated with, especially as it relates to PAUL BERGRIN. AHMADI continued that AHMADI had obtained this information through conversations with WILLIAMS, where the two (AHMADI and WILLIAMS) are both incarcerated at Hudson County Jail, in Kearny, NJ.

AHMADI stated that he (AHMADI) knew of WILLIAMS since 1985, and knew WILLIAMS' parents and WILLIAMS' AUNT SHEILA. AHMADI formerly lived in Building 178 of the Prince St Public Housing Project (PPHP), in Newark, NJ. AHMADI continued that, WILLIAMS moved with his parents, from Building 83 of the PPHP to Building 178,' in 1985. AHMADI often saw WILLIAMS visiting his (WILLIAMS) AUNT SHEILA, who lived on the 8th Floor of Building 178.

AHMADI stated that, WILLIAMS originally met PAUL BERGRIN through HAK CURRY aka E.T. HAK. WILLIAMS was close with CURRY. At this time CURRY worked for BERGRIN, moving drugs for BERGRIN. CURRY had BERGRIN represent WILLIAMS, when WILLIAMS was arrested with a gun in Essex County, NJ. According to AHMADI, CURRY is currently incarcerated in Colorado and once a year WILLIAMS will pay for CURRY's mother, CURRY's son and a third person to fly out to Colorado and visit CURRY.

AHMADI continued that WILLIAMS knew CURRY since WILLIAMS was at least 18 years old. During this time WILLIAMS would purchase "bricks" of cocaine from CURRY. According to AHMADI, WILLIAMS would ride to New York, New York, with CURRY, SHEIK LAST NAME UNKNOWN (LNU) and CURRY'S drug connection. AHMADI stated that it was at this time, CURRY had BERGRIN represent WILLIAMS, when

investigation on    01/06/2010    at Newark

File #.  9A-NK-117645_____Date dictated  01/07/2010

        SA Philip J. Blessington
by  ⌐ TFO Lou Velez

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a(Rev. 10-6-95)

9A-NK-117645

Continuation of FD-302 of   James T Ahmadi_____ .On 01/06/2010  , Page  2

WILLIAMS was arrested for shooting someone.' AHMADI stated that
BERGRIN used post-Traumatic stress defense for WILLIAMS, because
WILLIAMS brother had recently been killed by the police.

  According to AHMADI, WILLIAMS told AHMADI that WILLIAMS
was involved in a cocaine trafficking operation that involved two
Mexican brothers and a father, that where incarcerated on the same
Federal Tier of Hudson County Jail (that currently housed WILLIAMS
and AHMADI), a sister/daughter of the three men and a fourth man
named PAUL BERGRIN.  The female was the girl-friend of BERGRIN.
WILLIAMS told AHMADI that he (WILLIAMS) originally met the Mexican
men, who were incarcerated, through their sister/daughter.
According to AHMADI, WILLIAMS "on paper" was working for BERGRIN in
relation to BERGRIN's legal practice, although WILLIAMS actual
responsibility was to help BERGRIN move cocaine.  AHMADI stated
that WILLIAMS would meet the tall Mexican brother outside of a
brick building, the building was either BERGRIN's building or a
restaurant.

  AHMADI stated that WILLIAMS would pick up approximately
25 "Kilos" of cocaine, per meeting with the tall brother.  AHMADI
continued that WILLIAMS was originally being paid 2.5 points per
KILO, then 2 points per KILO, and eventually 1.5 points per kilo.
AHMADI stated that this lead WILLIAMS to start to develop another
connection in the Las Vegas area.  AHMADI stated that WILLIAMS
received the cocaine on consignment from the MEXICAN brothers.
According to AHMADI, WILLIAMS sold the bulk of the cocaine in brick
form, but a portion was broken down by WILLIAMS and sold on the
street.  AHMADI stated that WILLIAMS had recently obtained a
garbage removal route.  WILLIAMS would sell cocaine after
completing his (WILLIAMS) route.  AHMADI believes WILLIAMS worked
the route six days per week.

  AHMADI believes that WILLIAMS has a younger brother who
was arrested with 26 grams of cocaine.

  According to WILLIAMS, the female introduced all of the
men, because WILLIAMS was working for BERGRIN, at BERGRIN's law
firm, five days a week.  BERGRIN gave WILLIAMS a 645 BMW.  BERGRIN
needed WILLIAMS to move the "drugs" for BERGRIN.  AHMADI stated
that BERGRIN had used MONEY SPENCER, AZICEA LNU and HAK CURRY in
the same, role, before WILLIAMS, to move cocaine.  According to
AHMADI, WILLIAMS was "getting money" , only three months after
being released from incarceration.  WILLIAMS was viewed as one of

FD-302a(Rev. 10-6-95)

9A-NK-117645

Continuation of FD-302 of  James T Ahmadi_____ On 01/06/2010 , Page 3

the major cocaine suppliers in Essex County, however WILLIAMS would not sell heroin.

AZIZ SHABAZZ, also worked for BERGRIN, prior to FNU LNU aka KP. AHMADI stated that it is widely believed "on the streets", that SHABAZZ cooperated with law enforcement officials. AHMADI continued that there is paper work in circulation that stated SHABAZZ cooperated with law enforcement.

According to AHMADI, the Mexican brothers, have told WILLIAMS, he (WILLIAMS) needs to focus on getting back out on the street, so that they (WILLIAMS and Mexican brothers) can continue business. AHMADI continued that, WILLIAMS' sister is now handling the money for WILLIAMS and "running" things on the street. AHMADI also stated that WILLIAMS had contacted his (WILLIAMS) cousin KALIF LNU, to try to continue WILLIAMS' business partnership with BERGRIN's Crew.

AHMADI stated that WILLIAMS and the Mexican brothers arranged for BERGRIN's girlfriend to take twenty "Birds" (Birds is another term for Bricks in the world of illegal narcotics) of cocaine to WILLIAMS' father, so that WILLIAMS' father could then deliver the bricks to WILLIAMS' cousin. AHMADI stated that the plan did not work because WILLIAMS' father refused the delivery from BERGRIN's girlfriend because he (WILLIAMS' father) believed it was a "set-up."

AHMADI stated that WILLIAMS is able to keep in contact with the world outside of Hudson County Jail through two females, that WILLIAMS is involved with. AHMADI stated that women will help WILLIAMS talk to people over the telephone through a three way feature on the cellular telephone of the women. AHMADI stated one of the 'Women is an African-American female, with a light complexion, from Bradley Court Housing Project. AHMADI stated the second female, CONSTANCE LNU, is from Plainfield, NJ. CONSTANCE is a Corrections Officer for the New Jersey Department of Corrections at Northern State Prison in New Jersey. AHMADI described Constance as an African American female, with a dark complexion, thick build and short hair. AHMADI believes CONSTANCE has been working at NORTHERN STATE PRISON for two years. AHMADI stated that WILLIAMS had CONSTANCE three way phone call for AHMADI so that AHMADI was able to speak to someone as well.

AHMADI stated that WILLIAMS also told AHMADI that he (WILLIAMS) hired two top lawyers to defend WILLIAMS. AHMADI stated

FD-302a (Rev. 10-6-95)

9A-NK-117645

Continuation of FD-302 of ___James T Ahmadi_____, On __01/06/2010__ , Page __4__

that WILLIAMS' sister is now handling all financial matters for WILLIAMS, and WILLIAMS' sister is responsible for paying the lawyers, that are on WILLIAMS visit card at HUDSON COUNTY JAIL, where WILLIAMS is being housed on the tier for federal inmates.

AHMADI continued that, WILLIAMS stated BERGRIN is "two faced" and if WILLIAMS is forced to choose between himself (WILLIAMS) or BERGRIN, WILLIAMS is going to do what is best, for WILLIAMS. AHMADI continued that, WILLIAMS stated he (WILLIAMS) has information that will "burn" BERGRIN. AHMADI stated that WILLIAMS knows if BERGRIN revealed the name of a witness in the, "ANT CASE." According to AHMADI, WILLIAMS stated that when WILLIAMS is released from Jail, WILLIAMS plans to travel and leave the country.

AHMADI also provided information on other INDIVIDUALS associated with WILLIAMS or CURRY:

AHMADI stated he (AHMADI) believes that FIRST NAME UNKNOWN (FNU) LOYALS aka SHEIK, was arrested with cocaine and a "street-sweeper" (Street-Sweeper is a term that is often used to describe automatic weapons). According to AHMADI, SHEIK is now serving time in a federal prison in ARIZONA.

AHMADI stated that HAK owned a store "HEAT 2", in the Vailsburg section of Newark, NJ. According to AHMADI, HAK's wife has taken all of HAK's money and remarried. AHMADI believes the store is now owned by MIKE LNU aka FAT MIKE. According to AHMADI, FAT MIKE is the husband of WENDY WILLIAMS.

AHMADI believes HAK'S former associates; FNU LNU aka WAZING, FNU LNU aka OCTMAN and KENNY WOLFSON aka SALA were incarcerated, but now may own the back store of USA FITTED, which s located in Newark, NJ. AHMADI stated that HAK's former associates may be found at USA FITTED, most days, between 4:30 PM and 5:00 PM.

AHMADI also shared the following information as it relates to domestic and international terrorism: AHMADI stated that he (AHMADI) once met the, "BLIND SHEIK", while they were both incarcerated at BUTNER Federal Medical Center, located, in North Carolina. AHMADI stated that is the only contact he (AHMADI) ever had with the Sheik.

AHMADI is unaware of any individual or group, planning any type of violent action, or preaching to any person or group to

FD-302a(Rev. 10-6-95)

9A-NK-117 645

Continuation of FD-302 of  __James T Ahmadi_____ , On __01/06/2010__ , Page

engage in any violent action against the United States of America
(USA) or the interests fo the USA.

AHMADI stated he (AHMADI) prays outside of ROCKMAN's
MOSQUE on the top. AHMADI stated that he (AHMADI) believes the 4th
Avenue MOSQUE, in Newark, NJ, is a more radical mosque then the
mosque AHMADI attends. AHMADI stated that the mosque appears to
serve mostly as a drug connect for young kids. AHMADI stated that
the mosque located off of the Oraton Parkway is becoming unpopular.
AHMADI believes that the IMAM made statements that turned people
away. AHMADI said he is unaware of the content of those
statements.

# EXHIBIT C

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   01/26/2010

On January 25, 2010, DOUGLAS CANTEY, date of birth May 8, 1967, social security account number 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, imprisoned at New Jersey's Hudson County Jail, was interviewed pursuant to a proffer agreement at the Newark United States Attorney's Office, located at 970 Broad Street, Newark, New Jersey, 07102. The interview was conducted by Assistant United States Attorney (AUSA) Rachael A. Honig in the presence of Special Agent (SA) Brian M. Hughes, SA Nicholas J. Wessman, SA Brett M. Yeager, and Federal Public Defender Lisa M. Mack.

The interview was conducted to obtain information about conversations CANTEY had with ABDUL WILLIAMS aka MUTALIK or MU while imprisoned together in Hudson County Jail. After being advised of the identity of the AUSA and Special Agents, CANTEY provided the following information:

Approximately two weeks ago on a Friday, CANTEY attended a proffer with AUSA Anthony Mahajan. CANTEY has never previously cooperated with the federal government in any prior cases.

CANTEY has two prior federal convictions and one conviction in the state of New Jersey. All convictions were related to credit card fraud. CANTEY has been imprisoned in Hudson County Jail since July 30, 2009. A typical day at the prison consists of doors opening at 6:30 am, prisoners may use common area until 1:00 pm when they must return to cells for recount, doors open again at 2:30 pm, and prisoners may use common area until 9:00 pm before returning to cells for night. Two tiers exist for the prisoners.

WILLIAMS arrived to Hudson County Jail two to three weeks after CANTEY's July 30, 2009 arrival. WILLIAMS' cell mate was DAVID KIRKLAND. KIRKLAND was awaiting sentencing for burglary at the time. CANTEY knew KIRKLAND growing up. During a visit to KIRKLAND's cell on the day WILLIAMS arrived, CANTEY introduced himself to WILLIAMS. CANTEY had never met WILLIAMS prior to this. KIRKLAND asked WILLIAMS why he was in prison. KIRKLAND calls himself the "JOHNNY COCHRAN" of prison due to his knowledge of the legal system. KIRKLAND had cooperated with the federal government in the past, but CANTEY believed KIRKLAND was no longer cooperating at this time.

---

| Investigation on | 01/25/2010 | at | Newark, New Jersey |
|---|---|---|---|

File # 9A-NK-117645                                     Date dictated   01/26/2010

by   SA Brian M. Hughes; SA Nicholas J. Wessman
     SA Brett M. Yeager:bmy

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

9A-NK-117645

Continuation of FD-302 of ____DOUGLAS CANTEY_____ , On 01/25/2010 , Page ___2___

       Initially, WILLIAMS was standoffish.  Once WILLIAMS
realized CANTEY had prior experience in the federal prison and
court system, WILLIAMS began to ask questions about how bail
hearings work.  WILLIAMS started to open up conversations.  CANTEY
was looking for a lawyer named MALIK who had "beat the feds
before", and because MALIK worked at PAUL BERGRIN's law firm.
WILLIAMS said he knew MALIK, but BERGRIN represented him, not
MALIK.  When WILLIAMS once came from state prison, he went to work
for BERGRIN.  WILLIAMS worked there, but did not do any real work.
WILLIAMS ran drugs for BERGRIN to "get some money back".

       WILLIAMS was incarcerated for a gun charge, but he
claimed the gun was not his.  Another "guy" involved got no-billed,
but not WILLIAMS.  During a revocation hearing, police said they
never saw WILLIAMS holding the gun.  WILLIAMS had copies of
discovery material in his cell including police reports that he
showed to CANTEY in approximately October 2009.  WILLIAMS was
identifying discrepancies in the reports to CANTEY.  WILLIAMS was
trying to convince CANTEY of how he would beat the case by
exploiting these discrepancies.  WILLIAMS would seek out CANTEY
every day to discuss this.  WILLIAMS opened up more because of
CANTEY's knowledge of the federal system.

       In addition to discussing these items with CANTEY,
WILLIAMS also talked with "NY-EEN" (phonetic) or "NY-EVE"
(phonetic) AHMADI.  WILLIAMS and AHMADI are both from Newark, New
Jersey and they knew each other previously.  CANTEY is from
Paterson, New Jersey.  CANTEY indicated AHMADI is no longer at
Hudson County Jail.  CANTEY was "cordial" with AHMADI, but did not
consider him a close friend.  AHMADI was in prison for drug
violations and has dealt drugs.

       WILLIAMS told CANTEY that WILLIAMS' attorney was prodding
him to cooperate against BERGRIN, so WILLIAMS dismissed this
attorney and found a new attorney.  The new attorney put together a
bail package for WILLIAMS with lots of "good exhibits".  WILLIAMS
showed the package to CANTEY.  After reviewing the bail package,
WILLIAMS and CANTEY both felt WILLIAMS had a good chance of getting
bail and going home, but it was denied.

       Another prisoner known as "TITO" had the same attorney as
WILLIAMS.  "TITO" heard a prosecutor telling this attorney that
another indictment was coming down on WILLIAMS, and that the
indictment might involve witness tampering.  "TITO" conveyed this

FD-302a (Rev. 10-6-95)

9A-NK-117645

Continuation of FD-302 of _____DOUGLAS CANTEY_____ , On 01/25/2010 , Page ___3___

to WILLIAMS.  At this time, CANTEY had not considered coming
forward with this information to the federal government.  WILLIAMS
was concerned this new indictment could involve his role with two
other prisoners being held on the same tier in Hudson County Jail.
They are drug suppliers and are both BERGRIN's girlfriend's
brothers.  WILLIAMS felt the brothers were possibly cooperating
with the federal government.  WILLIAMS chose to avoid interacting
with them by exchanging greetings but not holding conversations
with them.  WILLIAMS was concerned the brothers were wired.

     WILLIAMS still felt he could beat the gun charge.  CANTEY
told WILLIAMS he is not seeing the big picture, and WILLIAMS should
realize they are holding him because of his links to BERGRIN.
WILLIAMS indicated he kind of felt that way, that is why he fired
his first attorney.

     WILLIAMS mentioned that BERGRIN had a previous conflict
with a man named MIKE-MIKE BRANCH.  At BERGRIN's command, two men
known as "AHK-MOOD" (phonetic) and "THE SHEIKH" "caught", or killed
BRANCH.  WILLIAMS typically runs with a group of four to five
others.  The only known names in this group are "ALI HAQ", "AHK-
MOOD", and "THE SHEIKH".  There is supposedly a mural of them
painted somewhere in Newark.  CANTEY does not know any of these
people personally.  WILLIAMS indicated the Federal Bureau of
Investigation (FBI) wanted "THE SHEIKH".  WILLIAMS felt getting
"THE SHEIKH" would be just as acceptable to the FBI as getting
BERGRIN.  Talking about BERGRIN to the federal government would
bring WILLIAMS deeper into the mesh, so WILLIAMS was resisting
cooperating with the government.

     The next indictment against WILLIAMS was for another gun
charge, not a witness tampering charge as WILLIAMS had suspected.
There had been some gang activity in a park, WILLIAMS matched the
description of a person with the gun, and then he was arrested.

     For a few days after WILLIAMS' bail was denied, WILLIAMS
was despondent and did not talk much.  Then, WILLIAMS pulled the
discovery material from his cell again to research an issue.
WILLIAMS showed CANTEY the officer who provided a statement in one
of the police reports was not the officer who arrested him.
WILLIAMS asked CANTEY for his opinion on this matter.  CANTEY told
WILLIAMS "if you wanna talk to me, talk to me" trying to find out
the real situation.  From this point forward, WILLIAMS "came clean"
and told CANTEY the truth.  At this point in time, CANTEY still had

(Rev. 10-6-95)

9A-NK-117645

Continuation of FD-302 of _____DOUGLAS CANTEY_____ , On 01/25/2010 , Page ___4___

not considered talking to the federal government about conversations with WILLIAMS.  It was not part of his mindset.

Subsequently, CANTEY and two other prisoners went to lockup for attempted extortion against CANTEY's "homeboy".  Somehow CANTEY felt he was implicated in this extortion although he did not do anything.  Within the last month, due to this implication, CANTEY decided to cooperate with the federal government.

WILLIAMS told CANTEY specifics about the initial gun charge.  When police arrived, WILLIAMS threw the gun.  The police reported they saw WILLIAMS throw the gun.  Two other men with WILLIAMS saw WILLIAMS throw the gun.  These two men and WILLIAMS were arrested and taken to prison.

BERGRIN got WILLIAMS out on bail and then told WILLIAMS if he can convince someone else to say they dropped the gun and not WILLIAMS, BERGRIN can get WILLIAMS out of this charge.  WILLIAMS got a "kid" from Newark with no criminal history.  The "kid" also needed some money.  $20,000 was offered to the "kid" to come forward and say the gun was his and not WILLIAMS'.  Some of the money would be paid to the "kid" up front, and the balance would be paid once WILLIAMS was cleared of the gun charge.  The money came from WILLIAMS but this was all orchestrated by BERGRIN.  BERGRIN also arranged the "kid's" attorney and the attorney coached the "kid" through the legal process.  Payments were made in cash through WILLIAMS' sister.  CANTEY did not know where the money originated.

Approximately 30 days later, the "kid" came forward to police to say the gun was his.  The "kid" was arrested and he was granted bail.  WILLIAMS was supposed to get charges dropped, but the "kid" had charges dropped instead.  During the hearing, the "kid" was instructed to plead the fifth amendment so he did not have to disclose the source of money used to pay his lawyer.  The "kid" completed his part of the deal, but the state grand jury did not charge the "kid".  WILLIAMS mentioned this to CANTEY when the idea of getting charged with witness tampering came about.

Since these conversations took place, CANTEY has been moved to a different tier than WILLIAMS.  WILLIAMS can still get access to CANTEY, but they no longer see each other or share the same common area.

FD-302a (Rev. 10-6-95)

9A-NK-117645

Continuation of FD-302 of  ___DOUGLAS CANTEY_____ , On 01/25/2010 , Page ___5___

On the bus ride over from Hudson County Jail to this interview, another prisoner on the bus said WILLIAMS might be ready to fold. This had something to do with "ALI HAQ" getting locked up over a couple kilos of crack cocaine.

Since the previous proffer with AUSA Mahajan, CANTEY has held no conversations with WILLIAMS.

AUSA Honig directed CANTEY not to raise this subject with WILLIAMS or attempt to gather any additional information if CANTEY were to come in contact with WILLIAMS in the future.

# EXHIBIT D

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription  01/28/2010

On January 26, 2010, JAMES AHMADI, date of birth July 4, 1968, social security account number 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, 1055 Bond Street, Elizabeth, New Jersey, imprisoned at New Jersey's Hudson County Prison, was interviewed and provided a proffer statement at the Newark United States Attorney's Office, located at 970 Broad Street, Newark, New Jersey, 07102. The interview was conducted by Assistant United States Attorney (AUSA) Rachael A. Honig in the presence of Special Agent (SA) Brian M. Hughes, SA Brett M. Yeager, SA Michael Rutkowski and Federal Public Defender, Peter Carter.

The interview was conducted to obtain information about conversations AHMADI had with ABDUL WILLIAMS aka "Multalik" while imprisoned together in Hudson County Prison. After being advised of the identity of the AUSA and Special Agents, AHMADI provided the following information:

AHMADI attended a proffer with AUSA Anthony Mahajan January 6, 2010. AHMADI has never previously cooperated with the federal government in any prior cases.

AHMADI has been imprisoned in Hudson County Jail for approximately six weeks. Prior to that he had been imprisoned in the Hudson County Prison from June 28, 2009 to September 11, 2009.

AHMADI knows WILLIAMS from when he was a little kid growing up in the Prince Street projects in Newark. WILLIAMS was in HAWK's crew. ROMEO WEBB used to deal with HAWK. WEBB used to live in AHMADI's building. WILLIAMS name was with the big hitters at the time. AHMADI ate dinner with WILLIAMS every night in the jail. "DIDDY", a Blood kid from Stafford Court introduced AHMADI and WILLIAMS. AHMADI and WILLIAMS share a common bond, they are both Muslim.

WILLIAMS told AHMADI about a gun charge and how he was trying to beat it. WILLIAMS told AHMADI that he was trying to hire a lawyer. WILLIAMS thought that he was going to get a witness tampering charge against him. WILLIAMS asked AHMADI about the phone bank at the Essex County jail and whether anyone was listening to his conversations. WILLIAMS said that he had conversations with PAUL BERGRIN and MUHAMMAD, a boy they were trying to get to take the gun.

---

Investigation on   01/26/2010   at  Newark, New Jersey

File #  9A-NK-117645                                    Date dictated  01/28/2010
        SA Brian M. Hughes:bmh; SA Michael Rutkowski
by      SA Brett M. Yeager

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

(Rev. 10-6-95)

9A-NK-117645

Continuation of FD-302 of ____JAMES AHMADI_____, On 01/26/2010 , Page ___2___

      Initially, WILLIAMS said it was not his gun and a kid, named MUHAMMAD came forward 30 days after WILLIAMS was arrested to claim it was his gun. WILLIAMS later admitted to AHMADI that it was his gun (WILLIAMS). When WILLIAMS got locked up in 2007, he got PAUL to have the other guy take the gun. WILLIAMS stated that PAUL "put him on a lawyer" and that WILLIAMS paid the lawyer to make an affidavit saying someone else owned the gun. WILLIAMS told AHMADI all of this on the night of December 14, 2009. WILLIAMS originally talked about parole hearing and about a cop who got caught up in the cross examination and the cop had to say that he didn't see MULTALIK throw the gun.

      AHMADI was sentenced to a program in September, but got out. On Monday, December 14, 2009, AHMADI was put in a cell (Hudson County) with WILLIAMS. WILLIAMS requested AHMADI come to cell with him since the jail was crowded and he had no cell mate at the time. AHMADI felt that WILLIAMS opened up to him because they grew up in the same area, both were Muslims and AHMADI had an understanding of the law. AHMADI has a rapport with the Bloods in prison, with whom WILLIAMS had an altercation with. WILLIAMS told AHMADI he fired his lawyer because the lawyer was pressuring him to talk about PAUL BERGRIN. WILLIAMS believed the Feds had nothing on him and they were going after PAUL BERGRIN.

      Another prisoner known as "TITO", told WILLIAMS that another indictment was coming down. WILLIAMS did not think it would be a gun charge, he expected it would be witness tampering and he was worried that law enforcement had listened to calls he made from jail. WILLIAMS fired his lawyer because he and TITO had the same attorney and he(WILLIAMS) believed the lawyer had told TITO about the indictment.

      WILLIAMS asked AHMADI legal questions about phone records. AHMADI told WILLIAMS that Essex County could pull phone records up because you have a pin, but that Hudson County does not have a pin. WILLIAMS also asked about recordings on the telephone. AHMADI inferred from this that he talked to MUHAMMAD.

      WILLIAMS knew two Mexican brothers that were running drugs. They were PAUL's girlfriend's brothers and they were in the Hudson County prison.

      On approximately December 18, 2009, AHMADI went into the hole because of an extortion charge. He went into the hole with 5

11-505a (Rev. 10-6-95)

9A-NK-117645

Continuation of FD-302 of _____ JAMES AHMADI _____ , On 01/26/2010 , Page __3__

other "dudes". (DOUGLAS CANTEY, GARY DOUGLAS, ART and "D").
DOUGLAS CANTEY asked AHMADI a lot of questions about WILLIAMS,
CANTEY asked about buying "coke" from WILLIAMS. CANTEY said he had
$12,000 and asked how much coke he could get. CANTEY asked whether
WILLIAMS would sell coke to him(CANTEY). AHMADI felt that CANTEY
was hunting for information to get his charges reduced. AHMADI
decided not to talk to CANTEY about WILLIAMS. WILLIAMS attempted
to talk to AHMADI after he got out of the hole, but he never had
the chance.

        WILLIAMS had his younger sister give MOHAMMAD money, so
he would claim the gun. WILLIAMS told AHMADI he threw the gun from
his cargo pocket when he was approached by the Police. WILLIAMS
said MOHAMMAD was there when the Police came. The Police never saw
WILLIAMS throw the gun, but they heard it. WILLIAMS paid the
lawyer and MUHAMMAD $5,000 through his younger sister. WILLIAMS
said even though the kid was no-billed, he was going to have him
come to court. The kid was going to plead the 5th, and just let
the affidavit speak, because WILLIAMS did not want to get into a
bind with the kid getting tripped up. Now, the kid does not want
to say it was his gun.

        All conversations between AHMADI and WILLIAMS regarding
paying MUHAMMAD and his lawyer to claim it was MUHAMMAD's gun
occurred between December 14-18, 2009. AHMADI and WILLIAMS are now
on different tiers in the prison and do not interact with each-
other.

        AUSA Honig directed AHMADI not to raise the subject with
WILLIAMS or attempt to gather any additional information if AHMADI
were to come into contact with WILLIAMS in the future.